

1       IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF OHIO

3              WESTERN DIVISION

4

5

6    ----------------------------------------
                                            :
7    TOMMY ROBINSON,                        :
                                            :
8              Plaintiff,                   :
                                            :
9        vs.                                :    CASE NO.
                                            :    C-1-02-441
10   TALBERT HOUSE, et al.,                 :
                                            :
11             Defendants.                  :
                                            :
12   ----------------------------------------

13

14

15       DEPOSITION OF:    TOMMY ROBINSON

16       TAKEN:            By the Defendants
                           Pursuant to Notice
17
         DATE:             February 11, 2003
18
         TIME:             Commencing at 2:12 p.m.
19
         PLACE:            Porter, Wright, Morris & Arthur
20                         2200 Chiquita Center
                           250 East Fifth Street
21                         Cincinnati, Ohio  45202

22       BEFORE:           Sharon A. Helfrich,
                           Notary Public - State of Ohio
23
24                                  ORIGINAL

**EXHIBIT A**

1    anything to me on day one about sleeping.

2            Q.    Were you, in fact, sleeping on day one?

3            A.    No.  I don't think I was.

4            Q.    On day two, do you remember being asked to

5    leave the training course?

6            A.    I remember an hour before time to leave,

7    that -- on a break time, you know, that was mentioned to me.

8            Q.    You were told to leave the training?

9            A.    That was mentioned to me.

10           Q.    And who told you to leave the training?

11           A.    I guess, one of the facilitators.

12           Q.    Do you remember whether it was Linda Zellers or

13   Jill Collins?

14           A.    Might have been Linda.

15           Q.    What do you recall was told to you?

16           A.    That, hey, you're tired and training is about

17   over anyway, about an hour to go, ain't no sense in your

18   staying here, because other people are looking at you.

19   Everybody is worn out.

20                 So, like I told them, I said I would have left,

21   but I was waiting for my vehicle.  Someone was working on

22   it.  And I would have left at lunch time, break time, early,

23   you know, but I had no way, no transportation.  So that's

24   the reason I stayed in there.

1        A.    No.

2        Q.    In your meeting with Ms. Tribble -- you just

3    testified with respect to the Thinking Training Seminar.

4    This Notice of Termination also mentions that "On August 21,

5    '01, you left the facility and failed to inform the staff of

6    your whereabouts."

7              Do you remember that discussion with Ms.

8    Tribble?

9        A.    No.  She didn't have anything to say.  I asked

10   her when -- this is the first time I had heard of something

11   of that nature.  And, you know, I don't think she said -- I

12   don't know if she said someone said it or what, but that's

13   the first time I had heard anything about that.  And I

14   hadn't left the facility so --

15       Q.    Where did you go on August 21?

16       A.    I hadn't left the facility.  I don't know who

17   might have said it, why she said it.  It might show on the

18   inspection log that I might have been downstairs doing an

19   inspection or, you know, anything.  So I don't know.  Or I

20   might have been outside doing an inspection.  That's part of

21   the duties.  You inspected the outside, around where -- the

22   clients' area, or you went downstairs or you went all

23   through the building.

24              So I don't know who said it, and why, or when,

1  or what.  I didn't get an explanation on that matter from

2  her.

3      Q.    And the next item in the Notice of Termination

4  states that "On August 22, '01 you left the B.A. machine

5  unattended despite an earlier warning by the manager on the

6  risk to the program of having this machine stolen or

7  damaged."

8          I think you previously testified that you

9  recall Ms. Tribble talking to you about that, correct?

10     A.    I remember her mentioning it, something to that

11 nature.

12     Q.    The next item --

13     A.    Which --

14     Q.    I'm sorry?

15     A.    I mean -- okay.  You need to know any more

16 information concerning that?

17     Q.    Well, I believe you testified that she had a

18 problem with your having it just laying on the counter.

19     A.    Well, I mean, I was using it, so I don't know

20 the problem.  That's why I said I don't understand why she

21 would have a problem with it.

22     Q.    But you knew she had a problem with it?

23     A.    She mentioned it, but I still couldn't figure

24 it out, because no one had access to it, but the ones I let

1  in the door.  When I let them in the door, I had to use it

2  in order to give a breathalizer.  And I think I had just let

3  some people in and they had went through.  And at this time

4  people were coming quite regular so, you know, for it to be

5  in a designated area all the time is unrealistic.

6         Q.    Okay.  The next item in the Notice of

7  Termination states that "On August 16, '01 and August 22,

8  '01, you failed to follow protocol and your supervisor's

9  instructions to complete your assigned tasks per shift."

10        Did you discuss that item with Ms. Tribble?

11        A.    She didn't know this is the first I'd heard. I

12  mean, you must understand that I was called in on my off

13  day, not knowing what it was for, and then I was given this

14  without any foregoing knowledge of what it was concerning

15  so --

16        Q.    Do you recall a discussion with Ms. Tribble

17  about that item in your Notice of Termination?

18        A.    I think I asked her about what, you know, what

19  exactly the nature of the accusation was, and she didn't

20  give me -- actually, at that time I think it was more or

21  less -- well, it don't matter, really, because I was asking

22  her different things, and, you know, just stating --

23  whereas, she had the right or authority to do whatever she

24  needed to do.

1         Q.    And the next item on the Notice of Termination

2   states "On August 22, '01 you were seen by your supervisor

3   removing Talbert House food items from the facility."

4         Did you discuss that item with Ms. Tribble?

5         A.    Yes.

6         Q.    What do you recall about that discussion?

7         A.    I had asked her -- by my supervisor.  I asked

8   her, when she was talking about eating a snack at the snack

9   box, and she said it was a Talbert House item, property.

10   And, you know, she was telling me what he said.  And I asked

11   her, why didn't Mr. Stecher say something to me at the

12   time.  And she said that I probably intimidated him.

13         Q.    What were the snacks that you took?

14         A.    I didn't take any.  I put them back.  The

15   supervisor was there.  And I said, out loud, I said I was

16   getting ready to get off.  And I said that, I guess I'll

17   take something to snack on -- which everyone does.  It's an

18   open box.  That's why I don't know why it was an issue about

19   any snacks being eaten out of that box, because meals and

20   everything else are eaten there.

21         But I think I mentioned or said that out loud.

22   That's the reason I know he heard me say that, I guess I'll

23   take a snack home with me.  And then I thought about it and

24   I said, no, I'm not really into a whole lot of sweets.

```
 1   That's too much sweets, you know.  And I put it back.  So he
 2   didn't see me take anything.
 3          Q.     So did you take a bag of snacks out of the
 4   program?
 5          A.     No.  I took what I said, when I went and -- you
 6   know, no.  I had the snacks that I had brought, not Talbert
 7   House snacks.  I had eaten -- like everyone else, I have
 8   eaten a candy bar or a bag of potato chips, but --
 9   Mr. Stecher, he did that.  Ms. Tribble, her husband, he
10   comes to the facility and he eats there.  The clients and
11   their kids eat there.  Visitors, they come, they eat stuff.
12   So I don't think -- I don't see what the issue was.
13          Q.     Do you recall any other discussion in this
14   Notice of Termination meeting with Ms. Tribble?
15          A.     Well, yes.  The thing about me being
16   intimidating to various people.  And the only thing I can
17   figure out is -- I don't know if it was my age or what,
18   because if I was -- I mean, when I asked why Mr. Stecher
19   hadn't said anything about that being a problem, that I was
20   getting this snack out of the snack box.  I passed it out to
21   the clients and the clients had already eaten out of that
22   and they'd already went upstairs.  And if there was a
23   problem, why didn't he say something.  Why didn't he mention
24   it.  He never mentioned it.  Since the time I've been there,
```

1   A. Yes, it is.  Yeah, all of it is.

2   Q. Is that your signature on the last page of the

3 document?

4   A. Yes.

5   Q. Okay.  And reviewing this document, can you

6 state what your claims are against Ms. Tribble?

7   A. In reviewing the document, I state that Ms.

8 Tribble had exercised abuse of authority to call me in on my

9 off day to terminate me from employment and to replace me

10 with a person there who -- or to return personnel who had

11 been off from work for sexual discrepancy.  To replace --

12 you know, call him back in to replace me.

13   Q. And that individual is Glenn Davis?

14   A. Yes, it is.

15   Q. And how was that an abuse of her authority?

16   A. Well, to call me in on my off day to terminate

17 me and to tell me about -- well, not to tell me about, you

18 know, any of the issues prior to her calling me in or to not

19 really give me any reason, reasonings, and any answers as

20 far as any concrete answers about who said what and for

21 saying that basically I was an intimidation, you know, at

22 the facility, and to charge -- I mean, and to state that I'm

23 stealing from Talbert House.

24   Q. You claim that they discriminated against you

1    because of your race?

2          A.    No.  I said age.

3          Q.    Okay.  And you claim she discriminated against

4    you because of your age; is that correct?

5          A.    Yes, ma'am.

6          Q.    And what facts do you have to support your

7    claim that she discriminated against you because of your

8    age?

9          A.    That she brought someone younger in to replace

10   me.  And she did it prior -- a day or two days prior to my

11   probationary period.  So I think it's preconceived.  And

12   it's conspired.

13         Q.    Who did she conspire with?

14         A.    As far as I know, Mr. Stecher.

15         Q.    And what facts do you know that she conspired

16   with Mr. Stecher?

17         A.    Because she is the one that gave me the paper

18   of termination and she is the one that did the terminating,

19   although it was my supervisor who made accusations and --

20         Q.    Do you have any other claims against Ms.

21   Tribble?

22         A.    Well, I say department practices were violated

23   within the facility.

24         Q.    What were the employment practices that were

1    Q.    What claims do you have against Mr. Stecher in

2    this complaint?

3    A.    That he falsely accused me of stealing.  And

4    that he never formally or verbally really reprimanded me

5    about things, the -- what was that -- the inefficiency, all

6    of the inefficiencies, all the lack of performances that I

7    supposedly had committed.  And also that, if so, as I said

8    on there, that knowing that I was inefficient on my job,

9    that he allowed me to work under new employees who came in,

10    to train them.

11    Q.    Do you claim any discrimination against you

12    due to your sex?

13    A.    No.

14    Q.    Do you claim any discrimination against you due

15    to your age?

16    A.    Yes.

17    Q.    What facts do you have to support your claim

18    that Mr. Stecher discriminated against you due to your age?

19    A.    My termination.

20    Q.    The fact that you were terminated?

21    A.    Yes.

22    Q.    Any other facts?

23    A.    Well, it's a fact in itself that the

24    circumstances of my termination as far as implicating -- you

1  know, the implication that was made and the fact that he

2  didn't tell me that he had a problem with me taking

3  something out of the -- you know, eating a snack or taking a

4  snack out of the box.

5       Q.    What do you mean, in your response to my

6  question, that implications were made?

7       A.    Implications that I did something wrong about

8  eating food or an item out of a -- you know, if I did eat an

9  item from Tender Mercies' (sic) snack box.

10      Q.    Do you claim that Ms. Tribble discriminated

11  against you due to your sex?

12      A.    No.  Well, let's see -- no.

13      Q.    Any other claims that you have against Mr.

14  Stecher in your complaint?

15      A.    Not at this time.

16      Q.    What claims do you have against Talbert House

17  in your complaint?

18      A.    Only that they failed to follow up on any

19  letters, communications that I sent to them, and that Ms.

20  Tribble and Mr. Stecher are part of their organization.

21      Q.    When you're saying that Talbert House failed to

22  follow up on letters of communication, are you talking about

23  Deposition Exhibit 8?

24      A.    No.  Because I sent another one to -- you know,

1    after sending one formally to Mr. Stecher and Ms. Tribble,

2    to them personally, I sent one to other people there.  In

3    fact, I sent one to Tilo.  I don't know if he got it or not,

4    see, because I did get one letter before I got to that

5    stage, that was a couple sentences that kind of negated all

6    that I said.  Just said that it disregarded what I said.

7            So they were not, you know, in -- I mean,

8    they were in favor of Mr. Stecher and Ms. Tribble.  So I

9    went to the facility, because I had been out town for a

10   while, and when I came back I went to the facility because I

11   understood that they had tried to get in touch with me.  But

12   when I went to the facility and asked for the person to let

13   them know I was there, I wasn't able to see anyone at that

14   time so --

15       Q.    So you do not claim that Talbert House

16   discriminated against you because of your sex?

17       A.    No.

18       Q.    And you claim that Talbert House discriminated

19   against you because of your age due to the action that you

20   have described by Ms. Tribble and Mr. Stecher?

21       A.    No.  I'd say that Talbert House is -- they are

22   Talbert House employees.  So Talbert House is responsible

23   for their action as well as they being reponsible for their

24   own actions.

1     Q.    Right.  So your claim of discrimination against

2   Talbert House on account of your age is the action of its

3   employees?

4     A.    No.

5     Q.    Of Ms. Tribble?

6     A.    No.  I didn't say that.  I said that -- you

7   know, I'm saying that they're responsible for their actions,

8   of their employees who are in the position, you know, in

9   that position.  If any violations occur in that position,

10  then I feel they're responsible for it also.

11    Q.    And the employees you're referring to are --

12    A.    Mr. Stecher and Mrs. Tribble.

13    Q.    Mr. Stecher and Ms. Tribble are the two

14  employees you're referring to and no other employees?

15    A.    No.  Those were my supervisor and my director

16  at the time.

17    Q.    What are you claiming as damages in your

18  complaint?

19    A.    I am claiming, because of my termination, I

20  feel that affected my obtaining employment for, you know,

21  other employment agencies.  And also the circumstances on my

22  record as far as the accusations of stealing, you know,

23  defamed my character such as it would be a very hard

24  thing -- I mean, you know, it's just a negativity on my

1      A.    I didn't put any items in the bag.  I started

2  to take one home after telling my supervisor.  You know, he

3  was there with me and I told him.  I said that's the only

4  way that he would know that I was going to take something.

5  And it wasn't a problem so --

6      Q.    So how do you know it wasn't a problem?

7      A.    Because everyone has done it.  He never said

8  anything before.  The employees do it, the employees' kids

9  do it.  I believe this lady had her kin folks or whatever

10 there.  They get bags of potato chips out of it.  It never

11 has been an issue.  It's not on any policy -- just like

12 meals, people who eat meals in a facility, you know.

13         Like I say, I have actually witnessed her

14 husband eating snacks out of the box, eating meals in the

15 facility.

16     Q.    On the day in question, what did you take out

17 of the snack box?

18     A.    Whatever it was, I put it back.  It might have

19 been some old off-brand, I don't know, candy or whatever,

20 you know.  I'm the one who sets it out at night.  I set it

21 out for the clients.  After the clients get through, there's

22 not too much of anything left.  They pick out what they're

23 going to get before they go to bed.  And I don't recall

24 if -- whatever it was, I didn't like it, because I chose not

1    to take it.

2        Q.    So is it your testimony on the day in question

3    that you never ate anything out of the snack box?

4        A.    I don't remember eating anything out of the

5    snack box.  I remember maybe taking something to snack on

6    later, but I changed my mind.  I remember changing my mind.

7        Q.    So you never ate anything out of the snack box?

8    Is that right?

9        A.    On that day I don't remember eating anything

10   out the snack box.  I was going to go home at the time he

11   came in.  Because he had been out all day.  He comes in

12   at -- right before I get off and I've sent the clients to

13   their rooms.  And he comes in then.  So I was trying to go

14   home.  I would have no reason to eat anything.  I had a

15   whole kitchen full of stuff.

16       Q.    Okay.  I am returning to you the originals of

17   your documents that you brought with you today, that you

18   feel are relevant to your claim.  We are going to be marking

19   those documents.

20             Earlier in your testimony you submitted two

21   Certificates of Attendance at training courses, and those

22   documents we're marking as Exhibits 4 and 5.

23             Defendants' Exhibits 4 and 5 were marked for

24             identification.)

1      A.    Yes.  That's what I received on July 11th.

2      Q.    And Exhibit 21 is a copy of a changing shifts

3  form requested from you, correct?

4      A.    Yes.

5      Q.    And those are all the documents that you

6  brought with you today that are relevant to your claim,

7  correct?

8      A.    Yes.

9      MS. O'CONNER:  Those are all the questions I

10      have of you today.  Thank you for coming.

11      THE WITNESS:  You're welcome.

12

13                    *Tommy Robinson*
                   TOMMY ROBINSON

14

15

16                    - - -

17      DEPOSITION CONCLUDED AT 4:50 P.M.

18                    - - -

19                                    ORIGINAL

20

21

22

23

24

**TO THE REPORTER:** I have read the entire transcript of my deposition taken on the 25th day of _March_, 20___, or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorized you to attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 10 | 4 | Two |
| 17 | 18 | from 1988 to 1999 |
| 24 | 17 | February 24 started at Talbert House |
| 26 | 13 | Activity Security Monitor |
| 36 | 3 | NO. |
| 39 | 3 | four (delete) |
| 45 | 8 | Was she talking - |
| 47 | 19 | imply I felt she was trying to put me down |
| 49 | 10 | Delores Rhodes |
| 53 | 18 | They attended another employee marriage Together |
| 54 | 7 | I think he was the oldest (delete) |
| 61 | 9 | allowed me to work over new employees |
| 61 | 10 | I trained them |
| 77 | 18 | Mrs. Jewel Stewart |
| 78 | 15 | Activity Security monitor. |
| 92 | 20 | . Stated That I saw Mr. Davis. |
| | | |
| 25 | 18 | initials of "T. R." |

_3-27-2003_
Date

_Tommy Robinson_
(Signature of Deponent)



RECEIVED
MAY 3 0 2002
KENNETH J. MURPHY, Clerk
CINCINNATI, OHIO

TO:        TOMMY ROBINSON

FROM:    KEITH STECHER

RE:        NOTICE OF TERMINATION

DATE:    AUGUST 24, 2001


Tommy, since your employment at Beekman, there have been several performance problems. You seem to lack understanding of the ASM job duties. After being closely supervised for six months, the following are some examples of the problems. On the dates of 6/25/01 and 6/26/01, according to training facilitator Linda Zellers, you fell asleep in Corrective Thinking Training and was asked to leave on 6/26 because your sleeping was disruptive to the group. On 8/21/01 you left the facility and failed to inform the staff of your whereabouts. Further, on 8/22/01 you left the B.A. machine unattended despite an earlier warning by the manager on the risk to the program of having this machine stolen or damaged. On 8/16/01 and 8/22/01. you failed to follow protocol and your supervisor's instructions to complete your assigned tasks per shift. Finally, on 8/22/01 you were seen by your supervisor removing Talbert House food items from the facility.

    As a result of your poor job performance and according to personnel policies, failure to meet the job requirements during your period of close supervision will result in termination of your employment effective immediately.


Keith E. Stecher, Supervisor

cc. Becky Foster, H.R.

**FORMAL APPEAL REGARDING
TERMINATION PROCEEDING OF
AUGUST 24, 2001**

# Memo

RECEIVED

MAY 3 0 2002

KENNETH J. MURPHY, Clerk
CINCINNATI, OHIO

DEFENDANT'S
EXHIBIT
8   2/11/23
Robinson

**To:** Doris Tribble

**From:** Tommy Robinson

**Date:** 8/31/01

**Re:** Termination Notice

---

This is a formal Appeal regarding your termination meeting, with notice. The basic focus of the notice rested on the premise of the lack of understanding, and/ or performance of my job duties as set forth by the program. I fail to see in the reasoning sequences as stipulated for your action, that substantiate that the job duties I performed was unacceptable. There are hearsay accusations for the most part, which has not a thing to do with my carrying out in an inefficient manner any procedures that were incorrect or inefficient as to be detrimental to the clients or the program.

FACT: The training that was referred to on June 25 & 26, 2001, was a voluntary sign up; event in which I had signed up for before I knew that I would find myself in a position of working double shifts prior to attending the training because of lack of coverage at the time. I was rest broken also from making preparation for my wedding that took place on June 28, 2001. Sorry you could not make it, although you did make it to Mrs. Foster (Robininsons'). You would have enjoyed it, as well. However, that was a pat tense situation, something that I though we, (Doris and myself), had left behind with the understanding that my enthusiasm and exhilaration toward the job after I returned from m honey moon would be noticeably increased, which it was, as seen by the Clients, as well as other staff members; but, of course you never were around any length of time that I was on duty to notice this.

It has been over two months since that incident, and until I received the termination notice on August 24, 2001. There had not been any indication or mention of any shortcomings concerning my job performance. I would think that's what a supervisor is supposed to do, to advice as well as supervise. Rather, I was asked to meet with you (Doris) and told some accusations of hearsay information that was supposed to have occurred within the last week or so leading up to my termination. How convenient!

You (Doris) made some statements in the meeting that could constitute a calculated effort as to intimidate one's self esteem. I was not, nor will I ever be intimidated by deviousness. Those meetings that Keith and you (Doris) had within that same week with the employee who isn't quite terminated, but by all decency and right should have been only confirmed by suspicious of what's really going on at the Beekman site.

In conclusion, I will reiterate that I was never formally supervised by the supervisor, rather, I was left alone on more occassions that I care to mention at this time, to perform the tasks that was really appropriate for two ASMs.

1

The records, as well as the truth, speak for itself. It can easily be substantiated that the supervisor has his own agenda of playing espionage games toward the Clients, as well as, devising schemes that change from week-to-week. That is where most of his time and effort go toward, and not the supervision of his staff.

Fact in point, upon openly and publicly watching me getting a few candy bars out of the snack box which had already been ravished by the Clients to their satisfaction, he (the supervisor) elected not to say that it was a problem with me honestly and openly getting something to take to snack on at home. Yet this comes up as an issue for the first time on August 24, 2001. Practically every staff, as well as their kids when they are brought to the facility, indulges in getting snacks out of that same box. Seem like you would have pulled a better straw than that one.

So as protocol dictate I forward this appeal notice. First to the parties concerned at this time. Looking to hear a satisfactory response within seven days of receiving this communication. I have the energy, and now thanks to you, I have the time to do what I have to do as you felt you did.

You were right when you said that you should have checked concerning me more so, before I came to your program. You mainly would have discovered that I hate lies, and when they are being applied to defile my character, I have to depend on the power of the Lord to direct me as always.

If I was never appropriate for the Beekman program why wait a day before my probation date came into view, then rush to have both of us come to the site on our day off for the express purpose of officially terminating me before my completion date of August 26, 2001. I could have transferred to another site if you needed the space or we know whom to return.

Sexism, and autonomy has no redeeming value within any organization.

I respectfully thank you in advance, and have a blessed day.


Formal Appeal

Seven (7) day response requested



Deacon Tommy Robinson

2648 Harrison Avenue, Apt. #14

Cincinnati, OH 45211

513-662-1488

*Tommy Robinson*